IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALMAC CLINICAL SERVICES, LLC, et al. | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO. 16-4896 |
| AERI PARK, et al. | : | |

O'NEILL, J.                                                                                     October 11, 2016

**<u>MEMORANDUM</u>**

On September 13, 2016, plaintiffs Almac Sciences, LLC and Almac Clinical Services, LLC filed a complaint against defendants Dr. Aeri Park and Triclinic Labs, Inc. in connection with Dr. Park's resignation from plaintiffs' employ and subsequent employment by Triclinic. Dkt. No. 1.  The amended verified complaint seeks both damages and injunctive relief based on claims of breach of contract against Dr. Park, violation of the Uniform Trade Secrets Act against Dr. Park and tortious interference with existing and prospective contractual relations against Dr. Park and Triclinic Labs.  Dkt No. 6.  Plaintiffs specifically request an injunction to prevent Dr. Park from working for Triclinic Labs for six months in conformity with plaintiffs' understanding of her employment agreement.  Dkt. No. 2. On September 13, 2016, I denied plaintiffs' request for a temporary restraining order.  Dkt. No. 7.

Presently before me is plaintiffs' request for a preliminary injunction and memorandum of law in support, Dkt. No. 2, plaintiffs' supplemental memorandum of law in support, Dkt. No. 20, and defendants' response.  Dkt. No. 19.  Following a brief period of expedited discovery, I held an evidentiary hearing and oral argument on October 5 and 6, 2016.  For the following reasons, I will deny plaintiffs' motion.

## BACKGROUND

I.  **Almac's Industry and Employment of Aeri Park**

Almac Group Ltd. is the parent company of several subsidiaries including Almac Sciences, Ltd., a U.K.-based company operating a lab in Craigavon, Northern Ireland that performs solid-state testing for pharmaceutical, academic and other customers, and Almac Clinical, LLC a U.S.-based company in Souderton, Pennsylvania that sells clinical packaging. Hr'g Tr. 17:3-18:4.  In 2009, Almac Clinical, LLC hired Dr. Aeri Park, an expert in solid-state chemistry, to establish a new company in the U.S. that would perform and sell solid-state and analytical testing services.  Hr'g Tr. 25:4-15; 26:11-19; 27:10-25.  In 2010, under Dr. Park's leadership, the Almac Group (the collective entities referred to as "Almac") created Almac Sciences, LLC, a chemical testing company incorporated in Delaware and based in Souderton, Pennsylvania.  Hr'g Tr. 27:10-25; 140:2-7.

Unlike solid-state testing, analytical testing involves dissolving substances in a medium before performing chemical tests.  Hr'g Tr. 144:16-18.  Solid-state testing, on the other hand, is a newer process that involves testing materials without physically altering their structures.  Hr'g Tr. 144:19-24.  Solid-state testing can detect chemical structures that are undetectable once a product is dissolved.  Hr'g Tr. 146:5-9.  Dr. Park was involved in the early solid-state research and litigation boom of the 1980s and invented some of the crystalline forms for which solid-state testing is used.  Hr'g Tr. 147:9-148:11.

During her first six months of employment with Almac Clinical, LLC, Dr. Park was seconded to the Almac offices in the U.K for training.  Hr'g Tr. 25:18-25.  After those six months, she moved to Souderton, Pennsylvania with instructions to launch a lab for Almac Sciences, LLC that would perform both solid-state testing and analytical testing.  Hr'g Tr. 26:4-

14.  Although Dr. Park developed a business plan to this effect in April 2010, Almac determined there was insufficient demand for solid-state testing in the U.S. and declined to pursue it.  Hr'g Tr. 71:17-74:2; 89:18-25; 143:1-24.  To date, Almac Sciences, LLC performs only analytical testing.  Hr'g Tr. 134:17-18.  According to Dr. Park, as of the time she left Almac, Almac Sciences, LLC did not use any solid-state testing equipment and did not have the capacity to perform solid-state services.  Hr'g Tr. 143:1-24.  The U.K. lab of Almac Sciences, Ltd. performs all the solid-state testing for Almac.  Hr'g Tr. 22:22-23:4.  While at Almac, Dr. Park engaged in such tasks as developing standard operating procedures, performing quality control, creating contingency plans, drafting white papers, developing vendor relationships, providing quotations and preparing requests for information and requests for proposals for clients, all on behalf of Almac Sciences, LLC.  Hr'g Tr. 28:22-37:11.

In 2015, the Almac Group evaluated Almac Sciences, LLC and found a number of compliance issues.  Hr'g Tr. 42:7-14; 149:9-12.  Almac asked Dr. Park to come to the U.K. lab for training and to manage the solid-state lab there.  Hr'g Tr. 42:8-12.  Dr. Park spent the last year of her tenure at Almac in the U.K., but instead of managing the solid-state lab, she performed sales duties and assisted in negotiating at least one deal to provide solid-state testing for a customer of Almac's U.K. lab.  Hr'g Tr. 42:15-23; 149:12-21; 164:4-165:25.  While in the U.K., Dr. Park told Almac she would not return to her position as Director of U.S. Operations.  Hr'g Tr. 149:22-150:11.  In the spring of 2016, Almac offered her a new position—Global Head of Solid-State Testing.  Hr'g Tr. 150:24-151:1.  She declined the position and tendered her resignation on May 13, 2016, but did not disclose any future employment plans.  Hr'g Tr. 151:2-3; Pls.' Ex. 40; 129:2-11.  In connection with her resignation, Dr. Park also sought and received from Almac a waiver to continue performing expert litigation services for one particular client.

Hr'g Tr. 107:1-5. Notably, Dr. Park is the only Almac employee who has ever provided such expert litigation services on Almac's behalf. Hr'g Tr. 132:7-9; 148:17-19.

## II.     Dr. Park's Employment Agreement with Almac

When Dr. Park accepted employment with Almac in 2009, she had signed both (1) an offer letter and (2) an employment agreement. Pls.' Ex. 4. The offer letter stated that "Almac Sciences" was offering her the position of Director of Operations (US). Pls.' Ex. 4. The letter went on to detail the proposed package of salary and benefits, as well as "Almac Sciences" policies. Pls.' Ex. 4.

Dr. Park's employment agreement, on the other hand, was with Almac Clinical Services, LLC. Pls.' Ex. 4 at 1. The employment agreement reiterated that her title would be "Director of Operations (US)," indicated she would initially work at the facility in Craigavon, Northern Ireland and set forth various restrictions with respect to confidential information and inventions. Importantly, § 8.0 of the employment agreement contained several "post-termination covenants (e.g. non-interference non-solicitation/non-competition)." This case focuses on § 8.1(e), which states in pertinent part:

> For a period of six (6) months after such termination, [you shall not] engage in any business activity that is competitive in any way with the business of the Company in any state in the continental United States and in Europe as well as any other state or foreign country in which the Company does business or is planning to do business.

Pls.' Ex. 4, § 8.1(e). The introductory paragraph of the employment agreement specifically defines the term "Company" as Almac Clinical Services LLC and "all affiliates of the Company, including but not limited to, all other divisions of Almac Group Limited, except for sections 8.1(d) and 8.1(e) where it shall mean Almac Clinical Services LLC only." Id. at Intro.

4

**III.     Dr. Park's New Employment at Triclinic Labs, Inc.**

Following several months of discussions, Triclinic Labs, Inc., based in Lafayette, Indiana, extended an offer of employment to Dr. Park on March 23, 2016.  Pls.' Ex. 43.  Triclinic is a small contract research organization specializing in solid-state chemical and solid-state analytical work for pharmaceutical and other clients around the world.  Pls.' Ex. 52.  In addition, it offers patent prosecution and expert litigation services.  Pls.' Ex. 52.  Triclinic presently employs approximately twenty people, seventy-five percent of whom are scientific staff.  Hr'g Tr. 168:21-25.  In the spring of 2016, Triclinic partnered with Novasep, a "supplier of services and technologies for the life sciences industry."  Pls.' Ex. 37; Hr'g Tr. 196:6-18.

Prior to offering a position to Dr. Park, Triclinic was aware of Dr. Park's six-month non-compete obligations to Almac.  Hr'g Tr. 182:17-21; 184:22-24.  As such, Triclinic determined that during her first six months of employment, Dr. Park would focus on "inward-facing activities" involving no client contact, no research and no consulting other than the one project for which she had obtained a waiver from Almac.  Hr'g Tr. 173:6-13; 187:11-17.  Since beginning with Triclinic, Dr. Park's work activities have included learning internal processes and procedures, formulating contingency plans, monitoring existing internal research projects, reviewing Triclinic's standard operating procedures, reviewing existing white papers drafted by Triclinic scientists, evaluating Triclinic's computer and software systems, reviewing and revising report templates, mentoring junior Triclinic scientists and evaluating Triclinic's existing vendor relationships.  Hr'g Tr. 116:10-121:22; Pls.' Ex. 42, ¶ 40.  According to both Dr. Park and Shawn Comella, Triclinic's CEO, none of these activities have any relation to any of the clinical packaging work performed by Allstate Clinical, LLC.  Hr'g Tr. 136:20-23; 175:4-5.

**IV.     Pre-litigation Discussions Between the Parties**

In early July 2016, executives at Almac discovered Dr. Park's new employment with Triclinic when they saw her updated LinkedIn profile. Hr'g Tr. 46:22-25. Almac contacted her at the end of July to determine if she had actually started work at Triclinic or simply intended to go there after the expiration of her six month non-competition agreement with Almac. Pls.' Ex. 33. Upon learning that she was already employed by Triclinic, Almac contacted both Dr. Park and Triclinic on July 27, 2016 to advise that Dr. Park was violating § 8.1(e) of her employment agreement. Pls.' Ex. 6. On August 1, 2016, Triclinic responded that it had placed Dr. Park in a position where she would be able to honor the terms of her agreement and that Triclinic offers unique services not offered by Almac. Pls.' Ex. 7. Following an exchange of additional letters through August 23, 2016, Pls.' Exs. 6 & 7, Almac initiated litigation against Dr. Park and Triclinic on September 13, 2016.

## DISCUSSION

Preliminary injunctive relief is an "'extraordinary remedy . . . which should be granted only in limited circumstances.'" S. Camden Citizens in Action v. NJ Dept. of Envtl. Prot., 274 F.3d 771, 777 (3d Cir. 2001) (quotation omitted). To obtain a preliminary injunction, the moving party "must demonstrate: (1) the reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. Moreover, the district court also should take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." Id. A failure to show either a likelihood of success or a failure to demonstrate irreparable injury "'must necessarily result in the denial of a preliminary injunction.'" Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012), quoting In re Arthur Treacher's

Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982). "Moreover, establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury." Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989) (internal quotation marks and brackets omitted).

Plaintiffs Almac Clinic Services, LLC and Almac Sciences, LLC seek a preliminary injunction against defendants Aeri Park and Triclinic Labs, Inc. in connection with their claims of (1) breach of post-employment covenants under Pennsylvania law; (2) violations of the Pennsylvania Uniform Trade Secret Act, 12 Pa.C.S § 3501, et seq.; (3) tortious interference with existing and prospective contractual relations with Almac's customers and (4) tortious interference with Dr. Park's contractual relationship with Almac. Because I find that plaintiffs have failed to prove likelihood of success on the merits as to any of these causes of action, I will focus my discussion on that element without opining on whether plaintiffs have satisfied their burden with respect to the remaining three elements of a preliminary injunction.

## I. Breach of Contract

Plaintiffs argue that Dr. Park has breached her employment agreement by working for a company that provides solid-state testing in competition with Almac Sciences, LLC. Defendants respond that plaintiffs are not likely to succeed on the merits of this claim because (1) the non-compete provision of the employment agreement is not enforceable and (2) no evidence exists to establish that Park has breached that agreement. Assuming that the non-compete provision is enforceable for purposes of this motion,[1] I find plaintiffs have not shown a likelihood of success on the merits of their breach of contract claim.

---

[1] I harbor some reservations about the enforceability of the non-compete provision at issue. Because restrictive covenants are disfavored under Pennsylvania law, they are strictly construed and must be carefully reviewed to ensure their reasonableness. Viad Corp. v. Cordial, 299 F.

"The paramount goal of contract interpretation is to determine the intent of the parties." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009) (citations and internal quotation marks omitted); see also Mellon, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980). Courts are to consider "not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." Am. Eagle, 584 F.3d at 582 (citations and internal quotation marks omitted); see also Camp Ne'er Too Late, LP v. Swepi, L.P., __ F. Supp. 3d __, 2016 WL 2594186, at *18 (M.D. Pa. May 5, 2016) ("Interpretation is not concerned with the parties' "post hoc judgment [s] . . . as to what should have been.") (internal quotations omitted).

The strongest objective manifestation of intent is the language of the contract. Mellon Bank, 619 F.2d at 1009. Pennsylvania courts[2] apply the "plain meaning rule" of interpretation of contracts, which assumes that the intent of the parties to an instrument is "embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Cnty. of Dauphin v. Fid. & Deposit Co. of Md., 770 F. Supp. 248, 251 (M.D. Pa.) (quotation omitted), aff'd, 937 F.2d 596 (3d Cir. 1991). Thus, where the words of the contract clearly manifest the parties' intent, a court need not "resort to

---

Supp. 2d 466, 476 (W.D. Pa. 2003). The provision at issue in this case restricts Dr. Park from "engag[ing] in any business activity that is competitive in any way with the business of the Company" in the United States, Europe or any other foreign country "in which the Company does business or is planning to do business." Pls.' Ex. 2, ¶ 8.1(e). Such language, absent any accompanying definitions, leaves the contract open for significantly different interpretations by the employee and employer and seems to inadequately inform Dr. Park of the precise limitations on her post-employment activity. See Fres-co System USA, Inc. v. Robert Bodell, No. 05-3349, 2005 WL 3071755 (E.D. Pa. 2005) (holding a non-compete forbidding employee from working in the employer's or its subsidiaries' "line of business" overbroad and unenforceable). Although such an ambiguity could render the entire non-compete provision unenforceable, I will assume it is valid solely for purposes of the present motion.

[2] The employment agreement at issue states that it shall be governed and construed in accordance with the law of Pennsylvania. Pls.' Ex. 4, ¶ 13.1.

extrinsic aids or evidence." Am. Eagle, 584 F.3d at 587 (citation and internal quotation marks omitted). The Court of Appeals has stated:

> [a contract] will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 93 (3d Cir. 2001) (quotations omitted). Contracts must be read to avoid ambiguities if possible, and "specific provisions ordinarily control more general provisions." Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 247 (3d Cir. 2008) (citations omitted).

The non-compete provision at issue in this case is unambiguous and therefore the express language of the agreement controls. Section 8.1(e) of the Employment Agreement provides:

> For the periods of time set forth below after the termination of your employment with the Company, for any reason, whether by you or the company, whether with or without Cause, you shall not, for our own benefit or for the benefit of any third party, directly or indirectly, in any capacity (as an employee, independent contractor, owner, partner or otherwise) participate in any of the following:
> . . .
> (e) for a period of six (6) months after such termination, engage in any business activity that is competitive in any way with the business of the Company in any state in the continental United States and in Europe as well as in any other state or foreign country in which the Company does business or is planning to do business. . . .

Pls.' Ex. 4, ¶ 8.1(e). While the precise nature of the "competitive" activities prohibited by the contract is undefined, the provision unequivocally precludes business activity that is competitive

9

"with the business of the Company." The introductory paragraph of the employment agreement specifically defines the term "Company" as Almac Clinical Services LLC and "all affiliates of the Company, including but not limited to, all other divisions of Almac Group Limited, except for sections 8.1(d) and 8.1(e) where it shall mean Almac Clinical Services LLC only." Id. at Intro. This provision expressly clarifies that Dr. Park is prohibited from engaging in only those business activities that are competitive with Almac Clinical Services, LLC, and not any other entity of Almac Group Limited.

Plaintiffs argue that such an interpretation fails to read the employment agreement in conjunction with the accompanying offer letter to Dr. Park, the circumstances of her hiring, the parties' intention and Dr. Park's subsequent course of conduct. They reason that at the time Dr. Park was hired, Almac Sciences, LLC was a company in formation but not yet formed. As such, for payroll purposes only, Plaintiff was hired by Almac Clinical, LLC. The parties fully understood, however, that she was being hired as Director of Operations (US) for Almac Sciences, LLC, as memorialized in the September 3, 2009 offer letter, and that the non-compete provision was to be applicable to all of the business of Almac Sciences, LLC. In turn, plaintiffs assert that under the only fair reading of the employment agreement, Dr. Park is barred from engaging in business activities competitive with either Almac Clinical, LLC or Almac Sciences, LLC.

Notably, however, plaintiffs' argument does not assert that the relevant portions of the employment agreement are reasonably susceptible to any alternative interpretation. As discussed above, under well-settled Pennsylvania contract law, where a contract is clear and unambiguous a court may look only to the express language of the agreement to ascertain the parties' intent. The employment agreement's introductory paragraph could not be clearer. It specifically

acknowledges the existence of the other Almac companies and makes the contract applicable to all such companies with the express exception of the non-compete provisions set forth in §§ 8.1(d) and 8.1(e). As to those provisions, the contract explicitly limits their applicability to Almac Clinical Services, LLC. Given the absence of any ambiguity in that language, the law does not permit reference to extrinsic evidence in order to determine the meaning of the contract. To the extent plaintiffs had intended to extend the scope of the non-compete to the business activity of Almac Sciences, LLC, the burden fell on them, as drafters of the agreement, to indicate as much in the contract. As plaintiffs failed to do so, they remain bound by the unambiguous language of the contract they prepared and signed.

Having determined that the unambiguous language of the contract prohibits Dr. Park from engaging in business activities that are competitive "in any way" with the business of Almac Clinical, LLC, I find that plaintiffs have not shown that Dr. Park is likely in breach of her non-compete obligations. According to the evidence presented in this case, Triclinic—Dr. Park's current employer—is a contract research organization specializing in solid-state chemical and solid-state analytical work. Hr'g Tr. 168:15–18. It also offers patent prosecution and expert litigation services. Id. Since Dr. Park started with Triclinic, she has performed "inward-facing activities." Hr'g Tr. 187:7–20. More specifically, her work has been

> limited to learning Triclinic's internal processes and procedures, formulating contingency plans for the company, addressing personnel issues, monitoring existing internal research and development projects, reviewing Triclinic's SOPs, evaluating Triclinic's existing equipment and supervising certification of that equipment, reviewing and editing existing white papers written by Triclinic scientists, evaluating Triclinic's computer software and computer system, reviewing and revising Triclinic's reports template, mentoring junior Triclinic scientists, and evaluating Triclinic's existing vendor relationships.

11

Pls. Ex. 42, ¶ 40.  The record contains no evidence that, in performing such tasks, she has used any proprietary or confidential Almac information.  Indeed, quite to the contrary, both Dr. Park and Shawn Comella, Triclinic's CEO, testified that Dr. Park has not used any Almac information in connection with her work at Triclinic.  Hr'g Tr. 131:7–137:6, 173:15–18.

By contrast, Almac Clinical Services, LLC engages in a distinct line of work.  At the preliminary injunction hearing, plaintiffs focused substantially on the business of Almac Sciences, LLC, which, as noted above, is not protected by the non-compete.  The only Almac representative to testify was Stephen Barr, who is the president and managing director of the various Almac Sciences entities but has no responsibility for Almac Clinical Services, LLC.  Hr'g Tr. 50:21–52:13.  The limited evidence and testimony Dr. Barr could offer regarding Almac Clinical Services, LLC revealed that the company engages in the packaging, labeling and distribution of clinical trial packs, and offers associated analytical support to the manufacturer of those products—services not offered by Triclinic.  Hr'g Tr. 17:16–18:14.  Almac Clinical is not involved with any solid-state chemistry and does not offer expert litigation services or patent prosecution or defense services.  Hr'g Tr. 76:19–22, 146:23–147:1, 148:16–149:5.  During the course of her tenure with Almac, Dr. Park did not do any work related to clinical packaging.  Hr'g Tr. 136:19–22.  In fact, although Almac Clinical and Triclinic may have some overlap in clientele, plaintiffs never presented any evidence or made any specific argument that Almac Clinical and Triclinic were actually competitors.

In light of this record, I find plaintiffs have not established a likelihood of success on the merits of their breach of contract claim.  Since beginning her tenure with Triclinic, Dr. Park has engaged in internal business development activities related to Triclinic's work with solid-state testing and expert litigation services.  Such activities are by no means competitive with the

business of Almac Clinical Services, LLC, which is a clinical trial packaging company and offers no solid-state testing or expert litigation services.  Given this obvious distinction, I hold that plaintiffs will not likely succeed in proving that Dr. Park breached her employment agreement.

## II.    Pennsylvania Uniform Trade Secrets Act

Plaintiffs also seek an injunction in relation to Dr. Park's alleged violation of the Pennsylvania Uniform Trade Secrets Act.  I again find that plaintiffs have not proven a likelihood of success on the merits of this claim.

The Pennsylvania Uniform Trade Secrets Act (PUTSA) "creates a statutory cause of action for injunctive relief, compensatory damages and exemplary damages for the actual loss caused by misappropriation of trade secrets and the unjust enrichment caused by such misappropriation."  Youtie v. Macy's Retail Holding, Inc., 626 F. Supp. 2d 511, 522 (E.D. Pa. 2009) (citing 12 Pa. Cons. Stat. § 5303–4).  To establish misappropriation of a trade secret, the plaintiff must show "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret in violation of that confidence; and (4) harm to the plaintiff."  Moore v. Kulicke & Soffa Indus., Inc., 318 F.3d 561, 566 (3d Cir. 2003); see also 12 Pa. Cons. Stat. § 5302.[3]  Failure to establish any one of the elements defeats the claim.  Block v. Blakely, No. 02–8053, 2004 WL 1902520, at *3 (E.D. Pa. Aug. 25, 2004).

---

[3] The full definition of "misappropriation" is: "(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it

Even assuming arguendo that the first two elements of this claim have been satisfied, plaintiffs have not adduced sufficient evidence on either the third or fourth elements. As to the element of use of the trade secret, plaintiffs contend that Dr. Park had access to substantial amounts of highly confidential information. Under the standard set forth by the Court of Appeals in Bimbo Bakeries USA, Inc. v. Botticella, plaintiffs claim they need not show actual disclosure but only a "sufficient likelihood or substantial threat of disclosure of a trade secret." 613 F.3d 102, 114 (3d Cir. 2010) (internal quotations omitted). Due to the competitive nature of Triclinic's business, they contend that Dr. Park will inevitably use her proprietary knowledge to influence her operational decisions for Triclinic.

I do not find that plaintiffs have met their burden in this matter. The case of Centimark Inc. v. Jacobsen, No. 11-1137, 2011 WL 5977668 (W.D. Pa. Nov. 29, 2011) offers significant guidance as to what constitutes "sufficient likelihood or substantial threat of disclosure." In that case, the defendant had access to a great deal of confidential business information during his employment with the plaintiff and accepted employment as the president of a competitor following his resignation from the plaintiff's employment. Id. at *12. The plaintiff argued that the defendant "will inevitably call upon or otherwise misappropriate the confidential proprietary and trade secret information he learned." Id. The court found that the plaintiff had failed to show the inevitability of such disclosure or even that there was "a sufficient likelihood or substantial threat of disclosure." Id. Specifically, the court observed that the plaintiff failed to present any evidence that the defendant disclosed any confidential information to other employers, the defendant turned over all equipment, documents and data to the plaintiff upon

---

was a trade secret and that knowledge of it had been acquired by accident or mistake." 12 Pa. Cons. Stat. § 5302.

announcing his resignation, the defendant reaffirmed his intent to fully abide by his employment agreement when announcing his resignation, defendant's new employer barred him from soliciting any customers of the plaintiff or conducting sales activities, the plaintiff produced no evidence that the defendant had contacted any of the plaintiff's customers, the plaintiff and the defendant's new company did similar work but focused on different markets, the defendant disclosed his restrictive covenants to his new company and, at the hearing, the defendant offered credible testimony that he had no intent to disclose confidential information. Id. at *13–15. Based on that evidence, the court determined that the plaintiff did not have a likelihood of success on the merits of its trade secrets claim. Id. at *16.

The evidentiary record in this case presents substantial similarities. Primarily, plaintiffs failed to present any evidence—and admitted they had none—that Dr. Park disclosed any confidential information to Triclinic or approached any Almac customers. Hr'g Tr. 77:1–9. Indeed, both Dr. Park and Shawn Commella affirmatively stated that Dr. Park had not disclosed any Almac information in the course of her employment with Triclinic. Hr'g Tr. 131:7–137:6, 173:15–18. Second, plaintiffs have not suggested that Dr. Park failed to turn over any proprietary equipment, documents or data to Almac upon tendering her resignation.[4] Third, prior to starting her employment with Triclinic, Dr. Park provided Triclinic with a copy of her employment agreement. Hr'g Tr. 130:7–18, 173:3–14. Fourth, Triclinic set up ground rules for Dr. Park to ensure that she would not violate her obligations during her first six months of

---

[4] At the hearing, plaintiffs presented evidence of two emails written from her Almac address that Dr. Park still had in her possession following her resignation from Almac. Pls.' Exs. 18, 51. Dr. Park admitted that she technically violated § 9.2 of her employment agreement and she should have deleted or returned the emails, but kept the emails for her own use in case any of her former customers contacted her. Hr'g Tr. 122:5–125:16, 139:6–13. She further stated that she has not disclosed these emails to anyone but counsel in this case. Hr'g Tr. 139:14–20. Given the limited number and content of these emails, I find they do not evidence a substantial threat of disclosure.

employment. Fifth, as explained in detail above, Almac Clinical Services, LLC and Triclinic engage in entirely separate markets: Almac Clinical sells clinical trial packaging while Triclinic offers solid-state testing and expert litigation services. Finally, based on my observations of plaintiff at the hearing and the description of her actions throughout the relevant time period in this matter, I find her testimony credible that she has not disclosed and has no intention of disclosing any of Almac's confidential information to which she was privy.

As to the element of harm to plaintiffs, the record is devoid of evidence that any Almac company has suffered damages as a result of Dr. Park's actions. Dr. Barr, who is responsible for ensuring the financial profitability of his companies, testified that as of 2015–2016 Almac Sciences was growing and making money. Hr'g Tr. 77:13–19. Plaintiffs offered no evidence of any lost customer, any lost revenue or any lost opportunities.

In short, I find that plaintiffs have not proven likelihood of success on the merits of their PUTSA claim. Therefore, I will deny the preliminary injunction on this ground.

### III.   Tortious Interference With Existing and Prospective Contractual Relations

Almac's final two claims allege tortious interference with existing and prospective contractual relationships by both Dr. Park and Triclinic. Specifically, Count III of the amended complaint asserts that both Dr. Park and Triclinic have used Almac's confidential and trade secret information to interfere in and harm Almac's existing and future relationships with its customers. Count IV claims that Triclinic has employed Dr. Park in a role that requires her to breach her obligations under her employment agreement. Given the overlap in proof required for these two claims, I address them jointly and find that plaintiffs have not shown a likelihood of success on the merits of these claims.

Pennsylvania has adopted section 766 of the Restatement (Second) of Torts, which sets forth the tort of intentional interference with an existing contract. Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978). Section 766 provides that:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

Restatement (Second) of Torts § 766. To establish tortious interference with an existing or prospective contract under Pennsylvania law, a plaintiff must prove four elements: (1) the existence of a contractual relationship or prospective contractual relationship between the plaintiff and another party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship or preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. See Phillips v. Selig, 959 A.2d 420, 428 (Pa. Super. Ct. 2008) (citing Restatement (Second) of Torts § 766B (1979); BP Envtl. Servs., Inc. v. Republic Servs., Inc., 946 F. Supp. 2d 402, 407 (E.D. Pa. 2013).

Plaintiffs do not offer sufficient proof of any of these elements. First, plaintiffs produced no evidence from which I can find the element of intent on the part of defendants to interfere with Almac's existing or prospective customer relationships or with Dr. Park's employment agreement. At the preliminary injunction hearing, plaintiffs attempted to create an inference of intent from the fact that Dr. Park accepted a job offer from Triclinic months before tendering her resignation to Almac and continued to work with confidential Almac information. Plaintiffs also noted that Dr. Park never disclosed her plans to anyone at Almac to take employment with Triclinic and Almac only discovered her new employment upon seeing her updated LinkedIn

17

profile. These facts standing alone, however, do not suggest Dr. Park intended to harm Almac's contractual relationships, but merely show her unwillingness to disclose her future career path to the employer she planned on leaving.

By contrast, the undisputed evidence regarding Dr. Park's and Triclinic's actions strongly negate any inference of intentional interference with Almac's contractual relationships. Dr. Park emailed her non-compete to Triclinic well before starting work. Hr'g Tr. 177:16–178:3. As a result of that non-compete, Triclinic set up verbal ground rules so that Park could respect her agreement with Almac. Hr'g Tr. 130:7–18, 173:3–14. According to those ground rules, Dr. Park could have no contact with clients, perform no research and engage in no consulting except for the projects for which Almac had previously given her a waiver. Hr'g Tr. 130:11–17, 173:5–12, Pls.' Ex. 42, ¶¶ 38–42. All record evidence suggests that since beginning at Triclinic, Dr. Park has fully respected those ground rules and honored her non-compete. Hr'g Tr. 137:3–20, 173:13–14. Plaintiffs do not dispute that Dr. Park's only customer contact since leaving Almac involved the customer subject to Almac's agreed-upon waiver to Dr. Park's non-compete agreement. Hr'g Tr. 137:20–138:1. Indeed, indicative of her continued awareness of and respect for her non-compete obligations, Dr. Park recently reached out to Almac regarding an opportunity to do consulting work for a South Korean colleague who needed assistance with non-Almac-related project. Almac declined to give her a waiver from the non-compete and Dr. Park has not pursued that opportunity. Hr'g Tr. 160:20–161:23. In short, far from showing intent to harm, Dr. Park's and Triclinic's actions show concerted efforts to ensure that they neither breached Dr. Park's non-compete nor improperly interfered in Almac's contractual relationships with its customers.

Moreover, proof of actual damages—a factor required for tortious interference claims—is conspicuously absent from the record. With respect to plaintiffs' claim against Triclinic for tortious interference with Dr. Park's employment agreement, I determined above that no breach of her contract has occurred or is likely to occur, meaning that plaintiffs' have incurred no damages for this claim. With respect to plaintiffs' claim against both Dr. Park and Triclinic for tortious interference with Almac's customer contractual relationships, the record is bereft of evidence. Dr. Barr, the sole Almac employee to testify, indicated that he is not aware of any lost customers or opportunities since Dr. Park's departure. Hr'g Tr. 77:1–8. While Dr. Barr remarked that the blind bidding process for customers would make it difficult for him to ascertain whether Almac lost any prospective customer contracts, the burden nonetheless remains on plaintiffs to establish likelihood of success on this element.

To satisfy their burden on the tortious interference claims, plaintiffs must put forth evidence on all four of the aforementioned elements. The evidentiary record, however, undermines any finding of either intent to harm or actual damages. As such, I deny the preliminary injunction on both of these claims.

## CONCLUSION

Having found that plaintiffs have not met their burden of proving likelihood of success on the merits as to any of their claims, I need not address any of the other elements required to grant injunctive relief. I deny plaintiffs' request for a preliminary injunction.